# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 22, 2013        Decided April 26, 2013

No. 12-1398

AMERICAN PETROLEUM INSTITUTE, ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

OXFAM AMERICA,
INTERVENOR

On Petition for Review of a Regulation of
the Securities and Exchange Commission

*Eugene Scalia* argued the cause for petitioners. With him on the briefs were *Thomas M. Johnson, Jr.*, *Robin S. Conrad*, *Rachel Brand*, *Harry M. Ng*, and *Peter C. Tolsdorf*.

*William K. Shirey*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Michael A. Conley*, Deputy General Counsel, and *Theodore J. Weiman*, Attorney. *Mark Pennington*, Assistant General Counsel, entered an appearance.

*Jonathan G. Kaufman*, *Marco Simons*, and *Howard M. Crystal* were on the brief for intervenor Oxfam America, Inc. in support of respondent.

*Dennis M. Kelleher* and *Stephen W. Hall* were on the brief for *amicus curiae* Better Markets, Inc. in support of respondent.

*Lauren Carasik* and *Eric L. Lewis* were on the brief for *amici curiae* United States Senators Benjamin Cardin, et al. in support of respondent.

*Jeffrey W. Mikoni* was on the brief for *amici curiae* Representatives Edward J. Markey, et al. in support of respondent.

Before: TATEL and BROWN, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), the Securities and Exchange Commission promulgated a rule requiring certain companies to disclose payments made to foreign governments relating to the commercial development of oil, natural gas, or minerals. Petitioners challenge the statute and the regulation, raising both constitutional and statutory claims. "[O]ut of an abundance of caution," petitioners also filed suit in United States District Court. Their caution proved prescient. For the reasons given below, we hold that we lack authority to hear this suit in the first instance and dismiss the petition for lack of jurisdiction.

**I.**

At issue in this case is a provision of the Dodd-Frank Act, now codified at section 13(q) of the Exchange Act, 15 U.S.C. § 78m(q), that addresses the "resource curse"—described by co-sponsor Senator Richard Lugar as a phenomenon whereby "oil, gas reserves, and minerals . . . can be a bane, not a blessing, for poor countries, leading to corruption, wasteful spending, military adventurism, and instability." 156 Cong. Rec. S3816 (May 17, 2010) (statement of Sen. Lugar). According to a report commissioned by Senator Lugar, the resource curse is attributable, among other things, to "revenue inflows from a dominant export commodity [that] cause [a country's] exchange rate to appreciate, making imports cheap, and undermine domestic production and economic growth by decreasing relative competitiveness." Minority Staff of S. Comm. on Foreign Relations, 110th Cong., The Petroleum and Poverty Paradox: Assessing U.S. and International Community Efforts to Fight the Resource Curse, at 10 (Oct. 2008). On the political front, the resource curse allows "[g]overnments with authoritarian tendencies [to] be insulated from domestic and international pressure by the steady stream of extractive revenues, sometimes leading to worse governance over time." *Id.* at 2.

Believing that "[t]ransparency empowers citizens, investors, regulators, and other watchdogs" to hold governments accountable, 156 Cong. Rec. S3816 (May 17, 2010) (statement of Sen. Lugar), Congress, through section 13(q), directed the Commission to promulgate a rule requiring "resource extraction issuer[s]"—defined as companies that are listed on a U.S. stock exchange and "engage[] in the commercial development of oil, natural gas, or minerals," 15 U.S.C. § 78m(q)(1)(D)—to disclose any "payment" to a foreign government or the United States government that is "made to further the commercial development of oil, natural

gas, or minerals," *id.* § 78m(q)(1)(C)(i). Section 13(q)'s disclosure requirement covers taxes, royalties, fees, production entitlements, bonuses, and "other material benefits" that the Commission determines are part of the "commonly recognized revenue stream" for extractive industries. *Id.* § 78m(q)(1)(C)(ii).

Section 13(q) requires resource extraction issuers to submit an "annual report" to the Commission detailing their payments. *Id.* § 78m(q)(2)(A). In this report, companies must disclose: (1) "the type and total amount of . . . payments made for each project of the resource extraction issuer"; and (2) "the type and total amount of such payments made to each government." *Id.* § 78m(q)(2)(A)(i)–(ii). The annual report must be "submitted in an interactive data format," *id.* § 78m(q)(2)(C), that includes "electronic tags" identifying, among other things, "the total amounts of the payments," "the currency used to make the payments," and "the government that received the payments," *id.* § 78m(q)(2)(D)(ii). Section 13(q)(3)(A) requires that "[t]o the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted under the rules" implementing the annual reporting requirement. *Id.* § 78m(q)(3)(A).

In September 2012, the Commission promulgated a final rule fleshing out the statute's requirements. *See Disclosure of Payments by Resource Extraction Issuers*, 77 Fed. Reg. 56,365 (Sept. 12, 2012). In its cost-benefit analysis, the Commission calculated that the "total initial compliance costs for all [resource extraction] issuers are likely to be . . . approximately $1 billion." *Id.* at 56,410. The Commission further predicted that "the ongoing compliance costs are likely to be between $200 million and $400 million." *Id.* at 56,411. Finally, assuming that four countries—Angola, Cameroon,

China, and Qatar—prohibit the disclosure of payment information, the Commission estimated that resource extraction issuers operating in those countries could lose over $12.5 billion if forced to sell their assets. *See id.* at 56,412.

Petitioners, the American Petroleum Institute, the Chamber of Commerce, the Independent Petroleum Association, and the National Foreign Trade Council, challenge section 13(q)'s and the regulation's disclosure requirements on First Amendment grounds. They also challenge both the regulation and the cost-benefit analysis on statutory grounds.

Although believing that original jurisdiction lies in this court, petitioners, acting "out of an abundance of caution," Petitioners' Br. iii, also filed suit in the United States District Court for the District of Columbia. *See American Petroleum Institute v. SEC*, No. 12-1668 (D.D.C. Oct. 10, 2012); *see also National Automobile Dealers Association v. FTC*, 670 F.3d 268, 272 (D.C. Cir. 2012) (describing this litigation strategy as "appropriate[]" when there is a question about whether the district court or circuit court has original jurisdiction). Although the Commission agrees with petitioners that we have jurisdiction to hear this petition for review, intervenor Oxfam America does not, arguing that petitioners must first sue in the district court. We begin and end with jurisdiction. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." (internal quotation marks and alteration omitted)).

**II.**

"Congress is free to 'choose the court in which judicial review of agency decisions may occur.' " *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (quoting *Five Flags Pipe Line Co. v. Department of Transportation*, 854 F.2d 1438, 1439 (D.C. Cir. 1988)). "In this circuit, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals." *National Automobile Dealers Association*, 670 F.3d at 270 (internal quotation marks omitted). "Initial review occurs at the appellate level only when a direct-review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency action." *Watts*, 482 F.3d at 505; *see also Preseault v. ICC*, 853 F.2d 145, 148 (2d Cir. 1988) ("A party seeking judicial review of administrative action may, ordinarily, 'draw in question the constitutionality' of the statute under which the agency acted." (quoting *Fleming v. Nestor*, 363 U.S. 603, 607 (1960))).

Here, Exchange Act section 25 establishes the framework for initial appellate review of Commission actions. Section 25(a) provides that a "person aggrieved by a *final order* of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals . . . for the District of Columbia Circuit." 15 U.S.C. § 78y(a)(1) (emphasis added). Section 25(b) provides that a "person adversely affected by a *rule* of the Commission promulgated pursuant to [Exchange Act] section [6, 9(h)(2), 11, 11A, 15(c)(5) or (6), 15A, 17, 17A, or 19] may obtain review of this rule in the United States Court of Appeals . . . for the District of Columbia Circuit." *Id.* § 78y(b)(1) (emphasis added). Thus, absent a grant of original appellate jurisdiction under section 25, a party must first proceed by filing suit in district court pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq.

Looking only at section 25's language, we think it apparent that this court lacks jurisdiction. Section 25(a) gives us jurisdiction over challenges to all final orders issued by the Commission under the Exchange Act whereas section 25(b) gives us jurisdiction only over challenges to rules promulgated pursuant to enumerated sections of the Act. Here, because petitioners challenge a *rule*, the operative provision is section 25(b). And because the Commission relied on none of the sections listed in section 25(b) when it published the resource extraction rule, *see* 77 Fed. Reg. at 56,417 (relying on Exchange Act sections 3(b), 12, 13, 15, 23(a), and 36), that should end the matter.

Petitioners argue that we nonetheless have jurisdiction under section 25(b) because it authorizes initial appellate review of rules promulgated under subsections 15(c)(5) and (6) and because the resource extraction rule invoked section 15 generally as one source of authority. But as the Commission has subsequently made clear, it relied not on subsections 15(c)(5) or (6) but rather on subsection 15(d). *See* SEC Jurisdiction Br. 2. This explanation makes perfect sense. Subsections 15(c)(5) and (6) regulate brokers and dealers, 15 U.S.C. § 78*o*(c)(5)–(6), while subsection 15(d) requires issuers to file supplementary information, *id.* § 78*o*(d). The resource extraction rule involves the latter, not the former. Given this and given that subsection 15(d) appears nowhere in section 25(b), we lack original jurisdiction under section 25(b).

Alternatively, petitioners contend that we have jurisdiction under section 25(a). In support, they rely on *Investment Company Institute v. Board of Governors of the Federal Reserve System*, 551 F.2d 1270 (D.C. Cir. 1977), in which we interpreted a jurisdictional statute's use of the term "order" to mean "any agency action capable of review on the

basis of the administrative record." *Id.* at 1278; *see also id.* at 1277 (commenting that " '[i]t is the availability of a record for review . . . [that] is now the jurisdictional touchstone' " (quoting *Deutsche Lufthansa Aktiengesellschaft v. Civil Aeronautics Board*, 479 F.2d 912, 916 (D.C. Cir. 1973))). We explained that because the typical Administrative Procedure Act case can be resolved on the administrative record, "a factual hearing in the district court is unnecessary." *Id.* at 1276. Indeed, "requiring petitioners challenging regulations to go first to the district court results in unnecessary delay and expense." *Id.*

According to petitioners, the same is true here. Pointing out that their challenge to the regulation can be resolved on "the basis of the administrative record," *id.* at 1278, petitioners argue that we must interpret the word "order" in section 25(a) to mean "orders" *and* "rules." We disagree.

*Investment Company Institute* involved a very different jurisdictional statute than the one we confront here. There, the statute authorized initial appellate review only of agency "orders." Here, by contrast, section 25(b) not only expressly authorizes appellate review of agency rules, but it limits that review to rules issued pursuant to specific provisions of the Exchange Act, leaving all others to be challenged in the district court. Indeed, as Oxfam points out, applying *Investment Company Institute* to section 25 would render section 25(b) superfluous since all Commission rules would be reviewable in this court under section 25(a). This would run counter to the "basic interpretive canon[]" that "a statute should be construed so that effect is given to all its provisions." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and alteration omitted).

Petitioners insist that applying *Investment Company Institute* would not render section 25(b) superfluous because, they say, it would retain independent vitality under a narrow set of circumstances. Citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), which holds that courts may go beyond the administrative record "when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review," *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (internal quotation marks omitted), petitioners argue in a footnote that "the *Investment Company Institute* definition of 'orders' would not apply where a rulemaking challenge required fact-finding by the district court." Petitioners' Br. 29 n.4. In other words, when *Overton Park* applies, the underlying premise of *Investment Company Institute* no longer controls and a Commission "rule" is no longer an "order" under section 25(a). Thus, petitioners conclude, when a party alleges bad faith or claims that an administrative record is insufficient to facilitate judicial review, original jurisdiction lies in the district court *except* for challenges to rules promulgated pursuant to the provisions specifically enumerated in section 25(b).

Again, we disagree. As an initial matter, reliance on extra-record evidence "is the exception, not the rule." *Theodore Roosevelt Conservation Partnership*, 616 F.3d at 514. More importantly, petitioners have pointed to no evidence that Congress intended section 25(b) to serve this function.

Petitioners' interpretation of section 25(a) would also eviscerate Congress's carefully constructed jurisdictional scheme—a scheme that becomes even more apparent when one delves into the history of section 25. As originally

enacted in 1934, the Exchange Act contained only section 25(a)'s grant of original appellate jurisdiction to review Commission final orders. *See* Securities Exchange Act of 1934, Pub. L. No. 73-291, § 25, 48 Stat. 881, 901–02. Congress, as the Third Circuit explained, "intended to insulate rules and regulations of the Commission" from judicial review. *PBW Stock Exchange, Inc. v. SEC*, 485 F.2d 718, 725 (3d Cir. 1973). At that time, Congress had yet to enact either the Administrative Procedure Act or the Declaratory Judgment Act, meaning that judicial review of agency action was generally limited to final orders. *See id.* at 722–26 (discussing the Exchange Act's legislative history and the state of the law in the 1930s). Given this statutory framework, courts of appeals relied on section 25(a) to dismiss petitions for review of Commission rules. *See id.* at 733; *NRDC v. SEC*, No. 73-1591, 1974 WL 3909 (D.C. Cir. June 17, 1974) (per curiam) (relying on *PBW Stock Exchange* in dismissing petition for review for lack of jurisdiction). Indeed, this approach followed our existing case law, which interpreted the term "order" in jurisdictional statutes to exclude initial appellate review of agency rules. *See, e.g.*, *United Gas Pipe Line Co. v. Federal Power Commission*, 181 F.2d 796 (D.C. Cir. 1950).

In 1975, Congress for the first time created original appellate jurisdiction over challenges to certain Commission rules. Recognizing that "[a]t the present time there is no Exchange Act provision for review of Commission rules" and therefore "review of rules, to the extent it is available, is . . . in the District Court," S. Rep. No. 94-75, at 36 (1975), Congress added section 25(b) to the Exchange Act. *See* Securities Acts Amendments of 1975, Pub. L. No. 94-29, § 20, 89 Stat. 97, 158–60. Congress did this because the "Court of Appeals appears to provide the most appropriate forum for . . . review in light of the fact that the District

Court's factfinding function is rarely necessary and the questions subject to review are likely to end up in the higher court anyway." S. Rep. No. 94-75, at 37. Significantly, however, Congress did not confer original appellate jurisdiction over *all* Commission rules. Unlike section 25(a), which confers original appellate jurisdiction over all final orders issued under the Exchange Act, section 25(b) is limited to specified Exchange Act provisions "directly relating to the operation or regulation of the national market system, a national clearing system, or the [Commission's] oversight of the self-regulatory organizations." *Id.* at 36. And as petitioners now concede, "the 1975 amendments to the Exchange Act added some new rulemaking authorities that were not included in Section 25(b)." Petitioners' Rule 28(j) Letter, at 1 (Mar. 25, 2013). In other words, although acknowledging that district court review of rules may be inefficient, Congress nonetheless authorized initial appellate review of only certain rules, leaving the rest to be challenged in the district court pursuant to the by-then-enacted Administrative Procedure Act.

Fast forward to 1990. In that year, Congress passed the Market Reform Act, which added a new provision to the Exchange Act—section 9(h)(2)—that prohibited practices adversely affecting market volatility. In order to ensure initial appellate review of regulations issued pursuant to the newly enacted section, Congress simultaneously added it to the list of provisions in section 25(b)—thus reiterating that initial appellate review of Commission rules hinges on section 25(b). *See* Market Reform Act of 1990, Pub. L. No. 101-432, § 6, 104 Stat. 963, 975.

By contrast, and critically for our purposes, when Congress enacted section 13(q) and directed the Commission to issue implementing regulations, it did not add section 13(q)

to the list of provisions contained in section 25(b). Given the statutory history, this suggests quite clearly that Congress, for whatever reason, intended challenges to section 13(q) regulations to be brought first in the district court.

Petitioners take a different lesson from this history. As they see it, Congress knows about *Investment Company Institute*—which overturned decades of precedent holding that "order" meant "order," not "rules"—and "has acquiesced in this interpretation for 35 years." Petitioners' Br. 29. Because Congress has amended the Exchange Act several times and "at no point . . . modified the provision for judicial review of 'orders,' " Petitioners' Br. 29, petitioners urge us to "interpret 'order' in the Exchange Act in its modern sense." Petitioners' Reply Br. 4.

It is true that we may assume that Congress knows our case law, *see Cannon v. University of Chicago*, 441 U.S. 677, 696–97 (1979), and petitioners' argument might well have some force if, following the addition of section 25(b) to the Exchange Act in 1975, courts had interpreted "order" in section 25(a) to include regulations. But as indicated above, *Investment Company Institute* involved a different statute, and petitioners have pointed to no post-1975 decision by this court, nor have we found one, expressly holding that "order" in section 25(a) encompasses regulations. Indeed, were petitioners correct, Congress would have had no need to revise section 25(b) in 1990. Given this, and given that petitioners' interpretation would render section 25(b) superfluous, the acquiescence principle cannot be extended quite so far.

Petitioners next rely on *Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985). There, as here, the question presented was whether a challenge to an agency action should

be heard initially in the court of appeals. Citing our decision in *Investment Company Institute*, the Supreme Court emphasized the advantages of initial appellate review when the "factfinding capacity of the district court is . . . unnecessary to judicial review of agency decisionmaking." *Id.* at 744. Accordingly, "[a]bsent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." *Id.* at 745. That said, "[w]hether initial subject-matter jurisdiction lies initially in the court of appeals must of course be governed by the intent of Congress and not by any views we may have about sound policy." *Id.* at 746. Applying these principles to the statutes before it, the Court held that the challenge at issue should proceed in the court of appeals, especially given the legislative history indicating that Congress favored initial appellate review. *See id.* at 737–41, 746.

Petitioners interpret *Lorion* as requiring us to resolve any ambiguity in section 25 in favor of initial appellate review. But petitioners have pointed to no ambiguity. *See American Portland Cement Alliance v. EPA*, 101 F.3d 772, 779 (D.C. Cir. 1996) (declining to apply *Lorion* when the jurisdictional statute was unambiguous). Although it is true that the legislative history of Dodd-Frank tells us nothing about what Congress intended with respect to section 13(q), we do know that since 1975 Congress has made clear that for the courts of appeals to have original jurisdiction over a challenged regulation, the authorizing provision of the statute must appear in section 25(b). And as noted above, Congress not only enacted section 25(b) knowing that district court review would be less efficient, but it then reinforced this approach in 1990, just five years after *Lorion*. In other words, unlike in *Lorion*, where the indicators of congressional intent favored

initial appellate review, all indicators here call for applying the statute's basic rule of decision: if the substantive provision is not listed in section 25(b), courts of appeals lack original jurisdiction.

But there is a potential glitch. When Congress enacted Dodd-Frank, it re-numbered section 9(h)(2)—the market volatility provision added in 1990—as section 9(i)(2), but failed to make a corresponding amendment to section 25(b)'s cross-reference to section 9(h)(2). *See* Pub. L. No. 111-203, § 929X(b)(1), 124 Stat. at 1870. If this suggests that Congress forgot about section 25's jurisdictional scheme with respect to section 9(h)(2), perhaps it also forgot about the provision with respect to section 13(q), thus creating an ambiguity that could trigger *Lorion*. Although petitioners failed to notice this problem, we must address it because "[a] federal court has the duty to determine whether it has subject-matter jurisdiction." *Bouchet v. National Urban League, Inc.*, 730 F.2d 799, 805 (D.C. Cir. 1984).

In the end, section 9(h)(2)'s re-numbering does not change our analysis. Congress's failure to update section 25(b) was far more likely the result of a scrivener's error. The Dodd-Frank Act is an enormous and complex statute, and it contains other scrivener's errors—for example, the same section now has two subsections numbered 9(j). *See* 15 U.S.C. § 78i(j). Section 9(h)(2)'s re-numbering thus offers us no insight into whether Congress might have overlooked section 25(b). To be sure, we might well suspect that this is exactly what happened, but we have no authority to speculate about congressional intent, especially when our jurisdiction is at stake. *See Sierra Club v. Thomas*, 828 F.2d 783, 792 (D.C. Cir. 1987) (explaining that appellate "courts have just so much jurisdiction as Congress has provided by statute"). We act on the basis of statutory language and probative legislative

history—all of which here indicate that this court has original appellate jurisdiction only over challenges to regulations whose authorizing provisions appear in section 25(b). A clerical error gives us no reason to depart from this scheme. Indeed, reading too much into a mere clerical error would run the risk of contravening *Lorion*'s reminder that questions of appellate jurisdiction "must of course be governed by the intent of Congress and not by any views we may have about sound policy." *Lorion*, 470 U.S. at 746; *see also Five Flags Pipe Line Co.*, 854 F.2d at 1441 ("[T]his court simply is not at liberty to displace, or to improve upon, the jurisdictional choices of Congress—even when it legislates by potpourri— no matter how compelling the policy reasons for doing so.").

Finally, echoing the reasoning in *Investment Company Institute* and *Lorion*, petitioners complain that forcing this suit to proceed first in district court would be inefficient because it requires no fact-finding and would simply delay the ultimate resolution of the case. But as we indicated above, *see supra* at 9–10, when Congress passed section 25(b), it knew it would be sending some cases to the district court that require no fact-finding. Indeed, under the Administrative Procedure Act, many challenges to agency regulations are heard first in the district court and then reviewed de novo by this court. To be sure, this may not be the most efficient way to resolve such cases, and we certainly understand petitioners' desire to have these important issues addressed expeditiously. But it is Congress's job, not ours, to determine " 'the court in which judicial review of agency decisions may occur.' " *Watts*, 482 F.3d at 505 (quoting *Five Flags Pipe Line Co.*, 854 F.2d at 1439).

## III.

For the foregoing reasons, we dismiss the petition for review for lack of jurisdiction. Because petitioners have

"simultaneously filed a complaint in the district court, we need not consider transferring the petition to that court." *National Automobile Dealers Association*, 670 F.3d at 272; *see also* 28 U.S.C. § 1631 (authorizing the transfer of a case when "there is a want of jurisdiction"). Additionally, our dismissal of the petition is without prejudice to petitioners' suit in the district court. *See National Automobile Dealers Association*, 670 F.3d at 272.

*So ordered.*