# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 13, 2017          Decided April 25, 2017

No. 15-1237

PORTLAND GENERAL ELECTRIC COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NORTHWEST & INTERMOUNTAIN POWER PRODUCERS
COALITION, ET AL.,
INTERVENORS

———

Consolidated with 15-1275

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Lawrence G. Acker* argued the cause for petitioner Portland General Electric Company. With him on the briefs was *Gary D. Bachman*.

*Eric Lee Christensen* argued the cause for petitioner PáTu Wind Farm LLC. With him on the briefs were *Peter J. Richardson* and *Gregory M. Adams*.

*Carl M. Fink* was on the briefs for intervenors Northwest & Intermountain Power Producers Coalition and Community Renewable Energy Association in support of petitioner in case No 15-1275.

*Elizabeth E. Rylander*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was *Robert H. Solomon*, Solicitor.

*Eric Lee Christensen*, *Peter J. Richardson*, and *Gregory M. Adams* were on the brief for intervenors PáTu Wind Farm, LLC in support of respondent in case No. 15-1237.

*Lawrence G. Acker* and *Gary D. Bachman* were on the brief for intervenor Portland General Electric Company in support of respondent.

Before: TATEL and SRINIVASAN, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This is a dispute between a small Oregon wind farm and the utility serving Portland over how much of the former's power the latter must purchase. The Federal Energy Regulatory Commission ruled that under the Public Utility Regulatory Policies Act and the power-purchase agreement between the parties, the utility must purchase all of the wind farm's power, though it rejected the wind farm's insistence that the utility do so by utilizing a technology known as dynamic scheduling. Both petition for review, and for the reasons set forth in this opinion, we dismiss the utility's petition for lack of jurisdiction and deny the wind farm's on the merits.

**I.**

The centerpiece of these consolidated petitions is section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), which Congress enacted in the wake of the 1973 energy crisis in order to "encourage conservation and more efficient use of scarce energy resources." *FERC v. Mississippi*, 456 U.S. 742, 757 (1982); *see* PURPA, Pub. L. No. 95–617 tit. II § 210, 92 Stat. 3117, 3144 (codified as amended at 16 U.S.C. § 824a-3). To accomplish this objective, section 210 seeks "to reduce reliance on fossil fuels" by increasing the number of what are known as energy-efficient cogeneration and small power-production facilities. *American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 417 (1983). Cogeneration facilities capture otherwise-wasted heat and turn it into thermal energy; small power-production facilities produce energy (fewer than 80 megawatts) primarily by using "biomass, waste, renewable resources, geothermal resources, or any combination thereof." 16 U.S.C. § 796(17)–(18). PURPA refers to both as "qualifying facilities." This case concerns a small power producer.

Recognizing that various obstacles were frustrating the development of such facilities, including the reluctance of traditional utilities to buy their power, *see Mississippi*, 456 U.S. at 750 (describing "imped[iments to] the development of nontraditional generating facilities"), Congress enacted in section 210 a "self-contained scheme" to mitigate those obstacles as well as to stimulate markets for non-traditional power, *Niagara Mohawk Power Corp. v. FERC*, 117 F.3d 1485, 1488 (D.C. Cir. 1997). Subsection (a) of section 210 directs FERC to promulgate broad, generally applicable rules that encourage small power production by, among other things, requiring utilities to sell power to and buy power from such facilities at favorable rates, as detailed in subsections (b)

through (d). *See* PURPA § 210(a)–(d). Subsection (e) authorizes FERC to ease the regulatory burdens on these facilities by exempting them from the Federal Power Act, as well as from certain federal and state regulations. *Id.* § 210(e). Subsection (f), in turn, requires state public-utility commissions to implement FERC's rules at the local level. *See id.* § 210(f). And subsections (g) and (h) establish a mechanism to enforce PURPA rights, allocating distinct responsibilities to state and federal forums. *See id.* §§ 210(g)–(h). We shall have more to say about these provisions in Part II, *infra*.

In 1980, FERC issued its first set of PURPA regulations, which required utilities to buy energy from small power producers "at a rate reflecting the cost that the purchasing utility [could] avoid [by] obtaining energy . . . from [the small power producer], rather than [by] generating an equivalent amount of energy itself . . . ." *Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978*, 45 Fed. Reg. 12,214, 12,215 (1980) (codified at 18 C.F.R. Part 292). This so-called avoided-cost rate usually exceeds the market price for wholesale power. *See, e.g.*, *New Charleston Power I, L.P. v. FERC*, 56 F.3d 1430, 1433 (D.C. Cir. 1995) (estimating $7 million-per-year difference between avoided-cost and market rates for one particular biomass facility). Under PURPA, state utility commissions are responsible for calculating the avoided-cost rates for utilities subject to their jurisdiction, which they may "accomplish[] by . . . issu[ing] regulations, [by addressing particular issues] on a case-by-case basis, or by [taking] any other action designed to give effect to the Commission's rules." 45 Fed. Reg. at 12,216; *see* PURPA § 210(b), (f), 16 U.S.C. § 824a-3(b), (f).

Oregon implements its PURPA responsibilities largely through its Public Utility Commission (OPUC), which, as

relevant here, has directed utilities subject to its jurisdiction to draft off-the-shelf, standard-form power-purchase agreements—replete with terms, conditions, and rate schedules—that OPUC then reviews for compliance with PURPA. *See* Oregon Public Utilities Commission Order No. 05-584, at 39–42 (May 13, 2005). OPUC has approved two standard-form power-purchase agreements submitted by petitioner Portland General Electric Co.: one for qualifying facilities directly linked to the utility's grid and another for "off system" facilities that must transmit their power through a separate transmission system to get to Portland's grid. *See* OPUC Order No. 07–065, at 1 (Feb. 27, 2007).

Petitioner PáTu Wind Farm LLC, a six-turbine, nine-megawatt generator in rural Oregon, is classified under PURPA as a small power producer. Because PáTu is not directly linked to Portland's grid, it sells power to Portland under the OPUC-approved power-purchase agreement for "off system" generators. In order to transmit its power to Portland's grid, PáTu obtains transmission services from two other entities: Wasco, a rural electric cooperative, and Bonneville Power Administration, a federal power agency. Wasco transmits PáTu's power to Bonneville, which in turn transmits it to Portland's Troutdale substation, the power-purchase agreement's designated point of delivery.

Before the ink had dried on the power-purchase agreement, the parties locked in a dispute over the nature of Portland's purchase obligation. PáTu believes that the agreement requires Portland to buy all of the power that PáTu generates at any given moment, which, for obvious reasons, varies with the strength of the wind. According to PáTu, moreover, the only way for Portland to buy all of its variable output is to do so using "dynamic transfer" services—a combination of hardware, software, engineering, and other

tools that involves "electronically transferring generation from the balancing authority area in which [the energy] physically resides to another balancing authority area in real-time." Timothy P. Duane & Kiran H. Griffith, *Legal, Technical, and Economic Challenges in Integrating Renewable Power Generation into the Electricity Grid*, 4 SAN DIEGO J. CLIMATE & ENERGY L. 1, 45 (2013) (citation and internal quotation marks omitted).

Portland has a different view of its obligations under the power-purchase agreement. Believing it has purchased a firm product, Portland requires PáTu to set day-ahead schedules under which the wind farm commits to deliver whole-megawatt blocks of energy for each hour of the day. If PáTu overschedules—that is, if it promises to deliver 3 megawatts but delivers only 2.3—Portland pays favorable avoided-cost rates for 2.3 megawatts and requires the wind farm to make up the difference by buying an additional .7 from Bonneville. Because the additional .7 megawatts are not generated by PáTu, however, Portland pays the wind farm only the lower market rate. By contrast, if PáTu underschedules—that is, if it predicts 3 megawatts but produces 4.8—then Portland accepts and pays for only 3, forcing the wind farm to dispose of the excess 1.8 at less-favorable rates.

In December 2011 PáTu filed a complaint with OPUC alleging that Portland's refusal to pay for all power PáTu delivers, regardless of whether the power is generated by the wind farm or Bonneville, violates both the power-purchase agreement and the state's PURPA rules and regulations. It also challenged Portland's refusal to utilize dynamic scheduling. Although OPUC saw nothing in the power-purchase agreement requiring Portland to utilize dynamic scheduling, it concluded that the utility must purchase all power PáTu generates and delivers. *See PáTu Wind Farm, LLC*, OPUC Order No. 14–287,

at 14 (Aug. 18, 2014). But drawing a distinction between power "produced" and power "delivered," OPUC appeared to leave Portland free to refuse to purchase any power produced in excess of what PáTu schedules (the underschedule situation). *See id.*

PáTu appealed to the Oregon Court of Appeals, which affirmed without opinion. PáTu then filed a Complaint with FERC, arguing, as it did before OPUC, that Portland must buy *all* of its output, scheduled or not, and that dynamic scheduling is the only way to accomplish that result. It grounded its argument not only in the language of the power-purchase agreement, but also in a FERC-promulgated PURPA regulation requiring utilities to purchase "any energy and capacity which is made available from a qualifying facility." 18 C.F.R. § 292.303(a). PáTu also alleged that Portland was violating FERC-issued Federal Power Act regulations prohibiting discrimination, as well as the Commissions' standards of conduct, which require a utility's transmission and merchant functions to operate independently.

FERC concluded that the power-purchase agreement and its PURPA regulations require Portland "to accept PáTu's *entire* net output . . . delivered to Portland . . . ." *PáTu Wind Farm, LLC*, 150 FERC ¶ 61,032, P 49 (Jan. 22, 2015) ("Initial Order"). Although the Commission rejected PáTu's specific request for dynamic scheduling, explaining that it has never required a utility to use any particular method to carry out its purchase obligation, it nonetheless made clear that, contrary to what OPUC had suggested, Portland may not escape that obligation by imposing overly rigid scheduling requirements or by refusing to purchase all power PáTu "produces." *Id.* PP 52–53. FERC dismissed PáTu's Federal Power Act claims, concluding first that because the wind farm is Portland's supplier, not its transmission customer, it has no basis for

alleging discrimination in the provision of transmission services. For similar reasons, it found that Portland was violating none of FERC's standards of conduct, as they, too, apply only to transmission providers. *Id.* P 56.

After FERC denied petitions for rehearing, *PáTu Wind Farm, LLC*, 151 FERC ¶ 61,223 (June 18, 2015) ("Rehearing Order"), PáTu and Portland both filed petitions for review. We consolidated the petitions and permitted Portland and PáTu to intervene as respondents to defend those aspects of FERC's orders they favor. Portland challenges only the PURPA-related aspects of FERC's orders, arguing that the Commission lacked jurisdiction to interpret a state-regulated power-purchase agreement. PáTu challenges FERC's rejection of its Federal Power Act claims.

## II.

We begin with Portland's petition and, as we must, with FERC's argument that we lack jurisdiction to entertain it. *American Petroleum Institute v. SEC*, 714 F.3d 1329, 1332 (D.C. Cir. 2013) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." (internal quotation marks and alteration omitted))). A full appreciation of the jurisdictional question we face requires some facility with how the enforcement and judicial-review provisions of PURPA and the Federal Power Act interact. Although resolving the jurisdictional question turns out to be relatively simple, we think it helpful to start with a thorough explanation of the statutory landscape, as it has long vexed utilities, qualifying facilities, state utility commissions, and even FERC itself.

9

**A.**

The Federal Power Act gives FERC broad authority to supervise "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." FPA § 201(b), 16 U.S.C. § 824(b). FPA section 205 "prohibit[s], among other things, unreasonable rates and undue discrimination 'with respect to any transmission or sale subject to the jurisdiction of the Commission,' 16 U.S.C. §§ 824d(a)–(b), and [section] 206 g[ives] the [Commission] the power to correct such unlawful practices, 16 U.S.C. § 824e(a)." *New York v. FERC*, 535 U.S. 1, 7 (2002). FERC exercises this authority by initiating administrative proceedings "upon its own motion or upon complaint." FPA § 206(a), 16 U.S.C. § 824e(a).

The Federal Power Act also creates a comprehensive scheme for obtaining judicial review of and enforcing FERC's orders. Section 313(b) establishes a right of review:

> Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order . . . in the United States Court of Appeals for the District of Columbia . . . .

FPA § 313(b), 16 U.S.C. § 825*l*(b). Sections 314 through 317, in turn, direct that any action to enforce any liability or duty arising under the Federal Power Act—whether by rule, regulation, or order—lies exclusively in federal district court, with appellate review to follow in the normal course. *See, e.g.*, FPA § 314(a), 16 U.S.C. § 825m(a) (directing FERC enforcement actions to proceed in district court); FPA § 316A(b), 16 U.S.C. § 825*o*–1(b) (authorizing FERC to assess civil penalties of up to $1,000,000 per day for disobedience of

any "rule or order"); FPA § 317, 16 U.S.C. § 825p (granting district courts exclusive jurisdiction over enforcement actions).

By contrast, PURPA section 210's judicial-review and enforcement provisions focus narrowly on advancing the statute's goal of encouraging development of nontraditional energy facilities like the wind farm at issue here. *New York State Electric & Gas Corp. v. FERC*, 117 F.3d 1473, 1476 (D.C. Cir. 1997) ("The Congress declared with specificity the means by which the ends of the PURPA are to be achieved."). Just as PURPA carves out precise responsibilities for FERC and the states in implementing its substantive goals, it "specifically delineate[s]" distinct enforcement "roles [for] the Commission, the state public utility commissions (PUCs), and the federal courts." *Connecticut Valley Electric Co. v. FERC*, 208 F.3d 1037, 1043 (D.C. Cir. 2000).

State-based adjudication serves as the mainstay for enforcing PURPA rights. PURPA section 210(g), entitled "Judicial Review and Enforcement," permits "any person" to "bring an action against any electric utility [or] qualifying small power producer . . . to enforce any requirement" created by a state's implementation of PURPA. PURPA § 210(g)(2), 16 U.S.C. § 824a-3(g)(2). Reflecting Congress's judgment that "federal rights granted by PURPA can appropriately be enforced through state adjudicatory machinery," *Mississippi*, 456 U.S. at 761, the statute channels actions under this subsection into "the appropriate State court," PURPA § 123(c)(1), 16 U.S.C. § 2633(c)(1); *see* PURPA § 210(g)(2), 16 U.S.C. § 824a-3(g)(2) (directing any action brought thereunder to proceed "in the manner, and under the requirements, as provided under section [123]"). It is this path that PáTu followed when it took its contract dispute to the Oregon Public Utility Commission.

PURPA gives FERC and the federal courts a separate and more limited role. Although section 210(h), captioned "Commission Enforcement," seems at first glance quite impenetrable, careful attention to its language reveals what Congress had in mind. We quote it here virtually in full, adding a few bracketed descriptors to help the reader:

(1) For purposes of enforcement of any rule prescribed by the Commission under subsection (a) of this section [requiring FERC to promulgate rules to encourage non-traditional power generation] with respect to any operations of an electric utility [*i.e.*, Portland], a qualifying cogeneration facility or a qualifying small power production facility [*i.e.*, PáTu] which are subject to the jurisdiction of the Commission under part II of the Federal Power Act [FPA § 201 *et seq.*], such rule shall be treated as a rule under the Federal Power Act. Nothing in subsection (g) of this section [providing for state judicial review] shall apply to so much of the operations of an electric utility [*i.e.*, Portland], a qualifying cogeneration facility or a qualifying small power production facility [*i.e.*, PáTu] as are subject to the jurisdiction of the Commission under part II of the Federal Power Act [FPA § 201 *et seq.*].

(2)(A) The Commission may enforce the requirements of subsection (f) of this section [requiring states to "implement" PURPA] against any State regulatory authority [*i.e.*, OPUC] or nonregulated electric utility. For purposes of any such enforcement, the requirements of subsection (f)(1) of this section [requiring states to "implement" PURPA] shall be treated as a rule enforceable under the Federal Power Act. For purposes of any such action, a State regulatory authority [*i.e.*, OPUC] or nonregulated electric utility shall be treated as a person within the meaning of the Federal Power Act. No

enforcement action [FPA §§ 314–317] may be brought by the Commission under this section other than—

> (i) an action against the State regulatory authority [*i.e.*, OPUC] or nonregulated electric utility for failure to comply with the requirements of subsection (f) of this section [requiring states to "implement" FERC's PURPA rules] or

> (ii) an action under paragraph (1) [*i.e.*, (h)(1)].

(B) Any electric utility [*i.e.*, Portland], qualifying cogenerator, or qualifying small power producer [*i.e.*, PáTu] may petition the Commission to enforce the requirements of subsection (f) of this section [requiring states to "implement" PURPA] as provided in subparagraph (A) of this paragraph [*i.e.*, subsection (h)(2)(A)]. If the Commission does not initiate an enforcement action under subparagraph (A) against a State regulatory authority [*i.e.*, OPUC] or nonregulated electric utility within 60 days following the date on which a petition is filed under this subparagraph with respect to such authority, the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority or nonregulated electric utility to comply with such requirements, and such court may issue such injunctive or other relief as may be appropriate. . . .

PURPA § 210(h), 16 U.S.C. § 824a-3(h).

Notice first how enforcement works under subsection (h). By providing that, in some circumstances, PURPA regulations "[f]or purposes of" enforcement "shall be treated as . . . rule[s] enforceable under the Federal Power Act," PURPA § 210(h)(1), (h)(2)(A), the subsection channels all enforcement

actions brought thereunder into the Federal Power Act's general enforcement scheme. *Industrial Cogenerators v. FERC*, 47 F.3d 1231, 1234 (D.C. Cir. 1995) (observing that subsection (h) relies on the Federal Power Act's enforcement provisions, citing FPA §§ 314 & 317, 16 U.S.C. §§ 825m & 825p). As explained above (*supra* at pp. 9–10), that scheme grants the "District Courts of the United States . . . exclusive jurisdiction" over all enforcement actions. FPA § 317, 16 U.S.C. § 825p.

The second thing to observe is that subsection (h) permits only two types of enforcement actions. Subsection (h)(1) addresses those situations where enforcing a PURPA rule necessarily requires regulating those "operations of an electric utility [*i.e.*, Portland] . . . or a qualifying small power production facility [*i.e.*, PáTu] which are subject to the jurisdiction of the Commission under part II of the Federal Power Act." PURPA § 210(h)(1), 16 U.S.C. § 824a-3(h)(1). In other words, if a PURPA enforcement action, in effect, regulates interstate transmission or wholesale generation—matters falling squarely within FERC's exclusive Federal Power Act authority—then FERC, not the state, oversees the enforcement action. *See id.* ("Nothing in [PURPA's state-court enforcement provisions] shall apply to so much of the operations of an electric utility [or] . . . qualifying small power production facility as are subject to the jurisdiction of the Commission under part II of the Federal Power Act.").

Consider, for example, a 35-megawatt wind farm which, as a PURPA qualifying facility, benefits from PURPA's requirement that utilities buy its power at avoided-cost rates. *See* PURPA § 210(a)(2)–(b), 16 U.S.C. § 824a-3(a)(2)–(b). Because Congress and FERC have chosen not to exempt from regulation qualifying facilities that generate more than 30 megawatts, the wind farm in our example—unlike PáTu—

remains subject to rate regulation under the Federal Power Act. *See* PURPA § 210(e), 16 U.S.C. § 824a-3(e) (permitting FERC to exempt certain qualifying facilities from regulation under the Federal Power Act); 18 C.F.R. § 292.601(b) (exempting only small power producers with a capacity of under 30 megawatts). For this hypothetical wind farm, then, a conflict could arise between, on the one hand, state authority to set the rate at which a utility must *buy* its power, and on the other, FERC authority to set the rate at which the wind farm must *sell* its power. Where such a regulatory overlap occurs, subsection (h)(1) provides that PURPA must be enforced by FERC via the Federal Power Act's district-court enforcement scheme rather than via PURPA section 210(g)'s state-court adjudication mechanism. *See* PURPA § 210(h)(1), 16 U.S.C. § 824a-3(h)(1) (precluding states from enforcing PURPA rules touching on FERC-jurisdictional "operations"); *Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978*, 23 FERC ¶ 61,304, 61,645–46 & n.6 (May 31, 1983) (interpreting subsection (h)(1) to give FERC the exclusive authority to "establish the rate for sale," and thus the "rate for purchase" for the 30-to-80 megawatt class of small power producers).

Subsection (h)(2) addresses a very different situation, *i.e.*, where a state, contrary to PURPA section 210(f), fails to "implement" FERC's PURPA rules. In such a case, subsection (h)(2) gives FERC authority to direct the state utility commission to comply, which the Commission accomplishes by treating PURPA's implementation obligation "as a rule enforceable under the Federal Power Act." PURPA § 210(h)(2)(A), 16 U.S.C. § 824a-3(h)(2). Like subsection (h)(1) actions, subsection (h)(2) actions require FERC to proceed in district court. *See* FPA §§ 314–317, 16 U.S.C. §§ 825m–825p. But unlike subsection (h)(1), subsection (h)(2) allows private parties to petition FERC to initiate such an

enforcement action, and, should FERC decline to do so, permits those parties to sue the state utility commission in federal district court. *See* PURPA § 210(h)(2)(B), 16 U.S.C. § 824a-3(h)(2)(B).

The final thing worth noticing about PURPA section 210(h) is the total absence of any provision for direct review of FERC orders that interpret PURPA. Although at first glance one might think that the Federal Power Act's broadly worded judicial-review provision would cover FERC orders interpreting PURPA, our court has ruled otherwise. As we made clear in *Midland Power Co-op. v. FERC*, FPA section 313(b) "limits review to orders issued in proceedings under the [Federal Power] Act—and [PURPA] § 210 is not part of th[at] Act." 774 F.3d 1, 3 (D.C. Cir. 2014). Instead, review of section 210(h) enforcement actions occurs on appeal from a district court's final decision. *See Industrial Cogenerators*, 47 F.3d at 1234 ("The decision of the district court is reviewable in the court of appeals in the ordinary course.").

There is, however, a caveat: in *Midland*, we speculated, though with healthy skepticism, that FERC orders purporting to resolve a PURPA dispute "might" be directly reviewable if they were "in fact . . . mandatory, in the sense that" they "fix[ed] the rights" of the parties and that "failure to 'comply' could expose [the losing party] to penalties as high as $1,000,000 a day under" the Federal Power Act's civil-penalty provisions. *Midland*, 774 F.3d at 6–7 (citations and internal quotation marks omitted). Because the order in *Midland* posed no such risk, we declined to decide "whether such a mandatory order might somehow fall within our jurisdiction." *Id.* at 7–8. It is precisely this hypothetical exception that PáTu believes applies here.

**B.**

With this background in mind, we turn to the question of whether we have jurisdiction to review Portland's petition. In its opening brief, Portland maintained that, by directing it to buy "all" of PáTu's power, FERC created binding duties that are directly reviewable under the narrow—hypothetical—subsection (h) exception left open by *Midland*. *See* 774 F.3d at 7–8. In response, FERC claims that the PURPA-related aspects of its orders are non-binding and that we therefore lack jurisdiction to review them. In reply, Portland hinted that it might agree, and then at oral argument confirmed it would concede that we lack jurisdiction were we to determine that FERC's orders in this case are in fact advisory. Oral Arg. Rec. 3:20–4:00. Intervening on behalf of FERC, PáTu disagrees, arguing that the orders are reviewable because, in its view, they bind Portland and represent an exercise of FERC's subsection (h)(1) enforcement authority.

We agree with FERC that this jurisdictional issue is controlled by *Midland*. Although FERC's order in that case contained some language that appeared mandatory—in particular, it directed that a cooperative utility "shall" reconnect with a specific PURPA qualifying facility, 774 F.3d at 3—we nonetheless treated the order as declaratory because it contained "neither any deadline . . . [for] compl[iance] nor any possible consequence of non-compliance," *id.* at 7. So too here. Although FERC's orders contain language that appears mandatory—*e.g.*, "ordering Portland General to accept PáTu's *entire* net output," Initial Order, P 49, and stating that Portland "must take from PáTu its entire net output," Rehearing Order, P 44—they neither set deadlines for compliance nor specify any repercussions for non-compliance. Given this, and given FERC's concession that the orders are declaratory, we have no jurisdiction to review them. *See Midland*, 774 F.3d at 7 (citing

*New York State Electric & Gas*, 117 F.3d at 1477 ("[We lack jurisdiction] to review a nonbinding declaratory order . . . .")); *Consumers Energy Co. v. FERC*, 428 F.3d 1065, 1067 (D.C. Cir. 2005) ("In evaluating FERC's interpretation of its own orders, we afford the Commission substantial deference . . . .").

Even so, we are mystified by FERC's continued use of mandatory language to resolve PURPA disputes in orders that it later insists are purely hortatory. *See, e.g.*, *Xcel Energy Services Inc. v. FERC*, 407 F.3d 1242, 1244 (D.C. Cir. 2005) (per curiam); *Niagara Mohawk*, 117 F.3d at 1488. Although *Midland* holds that such mandatory language, without more, is in fact declaratory, FERC could avoid a great deal of confusion and waste of judicial resources by not using words like "shall" and "must," and by making clear in its orders—as opposed to later in this court—that its discussions of PURPA-related issues are advisory only.

PáTu's jurisdictional theory suffers from a second defect. Recall that the wind farm argues that we have jurisdiction not just because it thinks FERC's orders are binding, but also because it believes that, pursuant to subsection (h)(1), they directly enforce PURPA against Portland. As explained above, however, the Federal Power Act and the relevant PURPA provisions confine FERC enforcement authority to wholesale generation and the interstate transmission activities of transmission providers. *See* PURPA § 210(h)(1), 16 U.S.C. § 824a-3(h)(1) (permitting FERC to treat PURPA rules affecting those "operations of an electric utility . . . subject to [its Federal Power Act] jurisdiction" as rules enforceable under the Federal Power Act); FPA § 201(b), 16 U.S.C. § 824(b) (granting FERC authority over wholesale generation and transmission). Although Portland is a transmission provider subject to FERC jurisdiction, it is not PáTu's transmission provider; that function is performed by Wasco and Bonneville,

who together transmit PáTu's power to Portland's Troutdale Substation. Portland is a *purchaser* of PáTu's power, which is why their relationship is controlled by a state-regulated power-purchase agreement, not a FERC-approved tariff, and why FERC's orders say nothing at all about transmission, focusing instead on Portland's obligation to "purchase" PáTu's power. *See* Initial Order, P 50. Because Portland provides PáTu with no transmission services, this case does not involve the "operations of an electric utility . . . subject to the jurisdiction of the Commission under part II of the Federal Power Act." PURPA § 210(h)(1), 16 U.S.C. § 824a-3(h)(1).

**III.**

PáTu's petition deals exclusively with Portland's refusal to utilize dynamic scheduling. The petition is without merit.

Citing FERC's anti-discrimination regulations, PáTu claims that Portland is discriminating against it "by systematically denying [PáTu] dynamic transfer services . . . while providing those same services to [Portland's] own generation resources." PáTu Br. 28–29. But as FERC explained in its rehearing order, *see* Rehearing Order, PP 57–58, every one of the regulations PáTu cites governs the relationship between transmission providers and transmission *customers*, *see, e.g.*, 18 C.F.R. § 358.2(a) (directing all "transmission provider[s]" to "treat all transmission customers, affiliated and non-affiliated, on a not unduly discriminatory basis"), and, as just explained, PáTu is not Portland's transmission customer, *see* Part II.B, *supra*.

PáTu next argues that Portland violated FERC's standards of conduct "when [its] Merchant personnel directed [its] Transmission [personnel] to deny dynamic scheduling services to PáTu." PáTu Br. 40. Promulgated by FERC as part of its 1996 decision to require utilities to unbundle their service

offerings, the standards of conduct were "designed to ensure that a public utility's employees . . . engaged in transmission system operations function independently of [its marketing-function] employees . . . who are engaged in wholesale purchases and sales." *Open Access Same-Time Information System (Formerly Real-Time Information Networks) and Standards of Conduct*, 61 Fed. Reg. 21,737, 21,740 (May 10, 1996). Because a utility's merchant function will frequently operate as a transmission customer of its own transmission function, however, FERC permits "[a] transmission provider's transmission function employee [to] discuss with its marketing function employee a specific request for transmission service submitted by the marketing function employee." 18 C.F.R. § 358.7(b). As the Commission explained, that is precisely what is happening here. Once PáTu delivers its electricity to Portland's marketing function, the standards of conduct allow the marketing function to choose what to do with it—including whether to use dynamic scheduling to distribute the electricity within Portland's grid. "Portland General's merchant arm," FERC explains, "not PáTu[,] is the customer transmitting energy on Portland General's system, [and] communications between Portland General's merchant arm and Portland General's transmission division concerning transmission of PáTu's power [therefore] did not violate the" standards of conduct. FERC Br. 54. That said, although Portland's actions are permissible under the Federal Power Act, they may, as FERC suggested, violate Portland's PURPA obligation to purchase PáTu's entire net output. *See* Initial Order, P 53 (noting that Portland cannot escape its "mandatory purchase obligation").

Finally, PáTu challenges FERC's refusal to address a filing it made during the proceedings before the Commission in which it asked FERC to modify Portland's transmission tariff to include dynamic scheduling. FERC rejected the filing

because it viewed the document as an "answer to a[n] . . . answer," which its procedural rules prohibit. *Id.* at P 48 (citing 18 C.F.R. § 385.213(a)(2) ("An answer may not be made to . . . an answer.")); *see* Rehearing Order, P 60. Protesting, PáTu argues, in essence, that its filing was not labeled an answer to an answer. That, however, makes no difference given that FERC, interpreting its own procedural rules, has long held that "the style in which a party frames a document . . . does not dictate how the Commission must interpret and treat it." *High Prairie Pipeline, LLC*, 149 FERC ¶ 61,004, P 8 (Oct. 1, 2014) (citing *Stowers Oil & Gas Co.*, 27 FERC ¶ 61,001 n.3 (Apr. 2, 1984)). Because PáTu nowhere argues that the Commission's interpretation of its own regulation is unreasonable, we have no basis for even considering whether FERC erred in rejecting PáTu's request. *See TRT Telecommunications Corp. v. FCC*, 857 F.2d 1535, 1552 (D.C. Cir. 1988) (concluding that courts owe considerable deference to an agency's "interpretation and administration of its own procedural rules") (emphasis omitted).

## IV.

For the foregoing reasons, we deny PáTu's petition and dismiss Portland's for lack of jurisdiction.

*So ordered.*